Good morning, and may it please the Court, my name is Jason Kim. Excuse me, if you'll just come and do it from the middle. It's been a while since I've done this. Do like those other guys did already. Sure. Good morning, and may it please the Court, my name is Jason Kim. I'm representing the Requester Plaintiff Appellant, in this case Prudential Locations LLC. What's at issue here are two very specific documents in which unidentified individuals leveled fairly serious accusations against my client. What my client is seeking to do is figure out the names of its accusers. About a year ago, more or less, this Court issued its opinion in Electronic Frontier Foundation v. Officer of the Director of National Intelligence. It's a very interesting and notable FOIA case. And that case addressed whether the director should disclose the identity of various agents and lobbyists for telecommunications companies that sought immunity from those companies' participation in warrantless wiretapping activities. And in that case, the Court observed that that particular situation was very unusual in the FOIA context and that there was little authority on the privacy interests under Exemption 6 when a private individual voluntarily seeks to engage with and persuade the government on a policy question. And it then concluded after reviewing the case law that the few cases considering this issue, and I quote, typically find in favor of disclosure, lacking countervailing concerns not present in this case. Our case, as well, also involves an attempt, as I said before, by two individuals to influence government action. In this case, by initiating regulatory investigations against my client credential locations. We believe that the EFF case controls here and specifically is salient to the situation here in no less than four ways. First, in that case, this Court held, and this should be obvious, that the public has a legitimate interest in knowing who is attempting to influence government action. In this case, especially with respect to the 2008 email, our concern and the public's concern is that you have a private individual who is sort of using HUD as a puppet and is the puppet master behind the initiation of a very costly and intensive investigation of our client. Second, this Court in EFF distinguished between the disclosure of merely a name and the disclosure of sensitive personal information. That's a quote from the case. This distinction is borne out by the Lassiter case, as well, from this circuit. Third, in the EFF case, this Court held that individuals have a diminished privacy interest where they're petitioning the government, again, I quote, petitioning the government for the performance of a public act. And it contrasted this with a situation in which the individual, and again, quoting, finds himself in government records through no action of his own. This is clearly a situation. Does that mean, for example, that in the Forest Employees and Lair case, that if any of these individuals had come forward to the government investigators as opposed to waiting until somebody found them, that would have been different? Yeah, I think there are two aspects to that. First, you know, I think we're in an area of no absolutes. I mean, I think the fact that if one of those witnesses came forward voluntarily, that would be a factor among other factors to look at. And second, I think, again, because we're not in a world of absolutes, but in a world of balancing, you know, we have to look at the extent of the engagement with the government. And to me, coming forward as a witness and volunteering a piece of information is very different from the nature of the two communications here, in which just from the face of the communications, especially the second one, it is really more of an advocacy that the government agency take a very specific action as opposed to being a helpful citizen and providing information that might be of interest to the government. Again, that really comes out in that second letter, which we haven't made a big point of it in the brief, but it's supported by the record below. Almost every sentence of that letter in terms of the description of the program is completely false. I want to ask you a question, but could you get to your fourth reason before I do so? I want to make sure that we hear all four of your reasons. Sure. And the fourth point of connection between the EFF case and this case is that the EFF case involves very weighty matters of national security. And in the opinion of this court, you know, specifically noted that in analyzing Exemption 6, we put those issues aside because what we're supposed to balance is only two things. One is the privacy interest of the individual affected. The second is the public's interest in disclosure. So we need to take out extraneous policy considerations. One thing that we're complaining about. Okay, I've got the fourth reason. Now, how broad is the definition of privacy? For example, is it an interest in privacy that the individual who wants his name concealed worries that he might face retaliation by the employer? Is that a privacy interest within the meaning of the term as it's used here? Absolutely. So then the question really is how much worry is there that there might be retaliation? Yes, Your Honor, exactly. And that's a very nice transition to my next point, which is looking at the record below that the district court was looking at. And maybe like the other case, it's a very thin record here. That is, we don't have any specific facts that would indicate any concern with respect to either of these individuals. You know, how much are we allowed just to bring into this our own common sense? If I'm an employee that ratted out my company, causing my company a lot of angst, a lot of expense and so on, I think if they knew who I am, I'm in trouble. Yes, Your Honor. And I'm a strong advocate in the FOIA cases of using, in a sense, categorical reasoning, which has been approved in the Londano case, which I cited. And I forget the specific case, but there's also a Ninth Circuit case, I believe, where they went through how in a FOIA case you don't necessarily need record evidence, but you can use common sense and categorical reasoning. Where that breaks down in this case is, for example, the example you used of an employee. Are these people employees? Are these people competitors? That is, if you're going to use categorical reasoning like that, it seems to me you at least need some foothold in the record. We have no idea who these people are or what their connection is to locations or whether they're in any way vulnerable to any sort of retaliation or adverse action by location. So how would that get in? The government would come in and say, we investigated in this person as an employee, so you should take that into account? Exactly, Your Honor. I think there would be nothing to prohibit HUD in this case. One, you could submit a declaration from these individuals under SEAL, contact them, or find information in the public record, at least generically, what category of person are they? Because the problem when you don't have anything in the record to support categorical reasoning is now you're just, all you're relying on is a speculative possibility that there may be unwelcome contact or retaliation. And the United States Supreme Court in Air Force v. Rose in the footnote there said, Exemption 6 requires more than a mere possibility of an invasion of privacy. And that's borne out exactly by the specific wording of Exemption 6. As I'm sure the Court is aware, the wording is very strong. It requires a finding that there would, disclosure would cause an unwarranted invasion of privacy. Not that it might cause such an invasion. The issue is whether it would. You know, we've distinguished various cases where the disclosure itself violates privacy because it tells the world some sensitive and private information about the individual. In this case, it's not the disclosure that would constitute the invasion of privacy. It's the consequences that might flow from the disclosure. So there needs to be some basis in either common sense or the record for saying that this unwelcome contact and retaliation is likely as opposed to possible. And I know, Judge, that you wrote the Lair Opinion, which addresses that issue. And Lair and Force employees were situations where there was an inevitable, you know, probability of what is probably unwelcome contact because in those cases, the information that they were seeking had no value to anyone unless those witnesses were contacted. So the unwelcome contact was intertwined with the information. That's certainly not the case here. If our client finds out – There's some whispers in your brief about Section 7D. Yes. And how it applies here or how its existence ought to influence the interpretation of Exemption 6. I gather that this – the rest of the situation is an enforcement action for purposes of Section 7 and Exemption 7. And so there's a strange situation where the Exemption 7D directly addresses this issue and Exemption 6 doesn't directly address it. How in general does FOIA deal with these kinds of overlaps? Sure. Your Honor, that's an interesting question. I know, again, going to the EFF case, you know, the Court noted that you just need one exemption to apply in order to withhold information. You don't need to look at the whole universe of exemptions. That's just logical. In terms of the interaction of Exemption 6 and Exemption 7, you know, the courts say that at least Exemption 7D, which is the most similar to 6, is more protective than 6. I think you've addressed what to me is a very, you know, important concern here, which is just the logic of the statute and how the different pieces should fit together. This issue of the efficacy of law enforcement and how disclosure of the identity of informants could harm that is sort of in the background. But it shouldn't be under Exemption 6. And, you know, I think I'm fortunate as a litigant that for its own reasons HUD never asserted Exemption 7. And I think it's important to note that because of that I think any far-reaching impact of this opinion that HUD or a ruling in our favor that HUD might hypothesize here is probably somewhat imaginary. I think if there really are legitimate law enforcement concerns about disclosing the identity of individuals who initiate government investigations, that those should be addressed specifically within the context of 7. And here, for example, they say that they have a practice of offering confidentiality and that they sometimes said that, but there's no assertion that the particular people involved here were assured confidentiality. Exactly. Exactly, Your Honor. That's exactly correct as a matter of the record. And that's why, you know, the outcome of this case seems to be it's quite intense. There's quite a bit of tension between that and Landano because, again, if you use this categorical reasoning as we pointed out in our brief, under the district court's reasoning, anyone who's involved with a law enforcement investigation basically will always be entitled to remain anonymous under Exemption 6. And if that becomes a de facto rule under Exemption 6, there's really nothing left of Landano, which requires that there be some particularized showing of a reasonable expectation of confidentiality. There's no such showing in this case at all. Your Honor, I have about three minutes, and I want to reserve that for rebuttal. Thank you. May it please the Court, Steve Frank on behalf of HUD. This Court has developed over the years a consistent line of cases protecting privacy, and it's followed the Supreme Court in that regard. The last six cases to reach the Supreme Court on privacy, the Court has come down on the side of privacy. And the last two cases, which I was fortunate enough to be involved in with Forest Service and law, and this case follows that line of cases. In that, Forest Service and law involve accident reports, eyewitnesses, law enforcement investigations. And that's what this case involves, people cooperating. This is what they all have in common. Came forward to invoke the government for involvement with the government, right? I mean, the thing about both those cases is these people were just going on about their lives and happened to be someplace that they became of interest to the government and to outside people. So, I mean, there was the privacy interest in simply, you know, where were you that day? And the fact that you were in a certain place at a certain time and had something to do with this when you did not instigate yourself into it is a somewhat different thing, no? I would respond that I don't think that kind of factual difference, which I know Plaintiff is trying to make here, is significant. I think what you have to look at the broader picture, which is I think the rulings of those cases involve people, private citizens who are cooperating with the government in some kind of an accident report or a law enforcement investigation, whether they came forward or not. I think that's the broader ruling. This case is much weaker, though. You know, I think factually, I know this is, these are two sort of, you know, volunteers who came out of the blue, right? In fact, Mr. Kim says, you know, and one of those people, they're just full of falsehoods. But putting that aside, it's not like, you know, you're here witnessing an accident, right? Or, you know, whatever it is, and you become an eyewitness to something that becomes a subject of an investigation and you're, you know, you're not a volunteer. Like these people are volunteers. I would take exception with that, Your Honor, in this regard. I think the people in Forest Service and LAR were equally volunteers. The FBI was not at the scene the minute the plane crashed in LAR or at the fire the day it took place. They had to go out, they had to find these people, and these people had to agree to cooperate with the government. Oh, but that's the point. The FBI went out to find them. And then they agreed to cooperate. That's the point. I think it's really irrelevant whether or not they just happened to be there or not happened to be there. The point is they cooperated with the government. It's irrelevant because, you know, it's a difference, say, in the, you know, the Exemption 7 context. It's a difference between, you know, someone who just provides a tip and then a confidential informant, you know. Why would we want? Those are two different types of people, and these people are more like just tipsters. Why would we want to provide less protection to good citizens who are pointing out wrongdoing on the part of a large corporation which agreed in the settlement that it was violating RESPA by providing kickback? On one of them. On one of them. Not the other. And the government investigated both of them, and the government on the second one found that there was nothing to it. And the point we're trying to make is I was surprised here. They can challenge the investigation all they want to. And I noticed that- If I can interrupt for just a minute because I want to stay on the questions that Tashima was after, and that is, and it picks up on something that Mr. Kim said, what if, and I have no idea whether this is true, what if, for example, the second of the two people has a financial interest opposed to this company? It's a competitor. And thinks, you know, if I can get another investigation going, I can sully them, I can put them to great expense. I mean, this is all- By one email, I can put them to considerable expense, nuisance, and even possibly, I hope, disgrace. Is that person protected as a matter of privacy? Yes. Because? Because, on the one hand, he has a privacy interest. There's a privacy interest, which plaintiff conceded, of a possibility of harassment. On the other hand- I'm hypothesizing that he's doing this for nothing but evil motives. But let me point this out to you. I'm not saying this is the case. I'm just hypothesizing. And that's the problem. That's the problem. It's based upon pure speculation. If the plaintiffs had come forward and they had provided some evidence that bad things were going on or that the government was engaged in some kind of bad- But that's why they're asking for the information. I beg your pardon? That's why they're asking for the information. But you know, Your Honor, it's circular. The problem there is one can always say, well, we don't know who these people are. Their position is that you know who these people are, and if you want to assert that there's a privacy interest, you should come and tell something about who these people are. We don't know who these people are. We don't investigate these people. Anybody, any private citizen, any good citizen- And what's your position here? And if you didn't feel that, that's something else I suppose I'd like to know. I mean, usually if you've got a tip, you're going to go to the person who gave you the tip and find out more and find out what they know and how they know it. And that's a legitimate concern under the public interest, which is to find out what the government is up to, what the government standards are. We have asserted in our brief, and we speak on behalf of HUD, that HUD pays absolutely no attention to who the person is, whether they're a former employee or a competitor or what have you. Now, wait a minute. That's the policy. I want you to clarify. When you say you pay no attention to who they are, I mean, we don't pay any attention to who people are here in this courtroom, either in the sense of rich man, poor man, rich woman, poor woman, you know. But we know a lot about them. Now, are you saying you don't know anything about these people? You don't know their names? You don't know their position? We know their names, but we don't go investigate. I think what this court was talking about in maybe it was the second argument where you're asking how do I know that you're really the lawyer for this guy. Well, there's a lot of case law in the Supreme Court that talks about the presumption of regularity, and that's what's here. HUD, like a lot of agencies, gets a complaint. I'm not accusing HUD of doing anything wrong at all. Okay. I'm just asking how much information HUD has about these two people. Well, as far as I know, they take the complaints for face value. You say as far as I know. What's that mean? HUD takes the complaints for face value. They do not investigate who the person is. Do they talk to the person? I do not know the answer to that question. Here's what I know. The name of the person, that's what we're talking about here today, is irrelevant to HUD, whether HUD conducts an investigation or not. The plaintiff is suggesting that HUD look at the name of the person, investigate the person first, see if they're a former employee or not. Here's what I'm driving at. In making a decision. Let me ask you this question. This is to follow up what Judge Fletcher said. In terms of his hypothetical about this, let's say the bad competitor or whoever it is, but in FOIA terms, is there less of a public interest in protecting that source? I think it makes no difference. In other words, under FOIA, it's as much of a public interest to protect, you know, the sources, the complaints to HUD, no matter what their motives are and, you know, what the effect might be on the target of the investigation. Absolutely. They're private citizens. Are you relying, just to clarify. Yes, ma'am. Are you relying on the confidentiality as a public interest or as the privacy part? Well, there's the balancing test on the privacy side. They have a privacy interest. These people are exposing wrongdoing. In that case, this is a stronger case than Forest Service or law because they're exposing wrongdoing, which plaintiffs have credentialed. You're not trying to put into the mix a public, a governmental interest in preserving confidentiality. I'm sorry. I missed that. You're not trying to put into the mix a governmental interest in preserving confidentiality. I'm not saying that that's a central part of the balancing test. Does it belong in any place? I am saying, as we have cited in our brief, page 36 or so, a lot of courts have considered that countervailing. Shouldn't that be under 7D or not at all? That's a whole other thing. I don't think. One thing I looked at is that the main case that I could find that did that was this Washington Post case, and that was before 7D was amended. This court, it's a complicated question, and this court does not have to reach that because in this case, the judge conducted the balancing test and came out on the side of privacy, as has this court in the last two cases, and then just threw that in. It was a boundary of 7D and 6. I mean, why should this all be going on in the context of Exemption 6 when it is explicitly covered by 7D and it has a standard which essentially says that there has to be an actual promise of confidentiality before you have a confidentiality interest? Why should we be redoing it under the 6 rubric? I may be slow, Your Honor, but I can't for the life of me really understand the argument. There are different exemptions under FOIA. The fact that something is exempt under 2 does not nullify 6 or 7D. Well, that's true, but if you look at Exemption 6 on its base, to be frank about it, you would think it was covering what ordinary people call privacy, i.e., you know, it says medical records about a person, which these are not really, they're not records about a person, and about medical care and personal things, things that deal with their personal lives. It's been expanded and Forrest employees and Lair have expanded it to this harassment concern and it's spilling over, and the question is how far do you let it spill? Well, but here's the critical point. Here's the answer. There are two different exemptions. They have two different burdens. If we could have met the burden of Exemption 7D, we would have invoked 7D because 7D is a categorical exemption. It doesn't involve any kind of balance. You meet 7D, there's an implied or explicit promise of confidentiality. That's it. It's done. But the problem is that the privacy interest that you're seeking to have balanced here is exactly the interest that's covered by 7D, right? The interest in speaking to the government confidentially. That's the point I'm trying to make. There's no balancing test under 7D. I understand that. And it's broader. So by not invoking 7D, which we did not, we are now taking the risk of holding it exempt under 6, which is a tougher burden for the government. But aren't you arguing for an essentially per se rule? No. Which becomes 7D? I'm sorry? Aren't you arguing for an essentially per se rule, which then becomes 7D? No, no, no. It's not a per se rule. This Court, the District Court, Chief Judge Mulway engaged in a very intelligent and thorough balancing test. That's what has to happen. What was the balancing? The balancing was that somebody who speaks confidentially to the government in a law enforcement situation might be harassed. Isn't that the same privacy interest that's covered by 7D? Is there anything different? There may be similar privacy. Maybe I'm not being clear, Your Honor. Forgive me. There may be similar kind of concepts of privacy, but there's no balancing test in 7D. So we're at a risk when we do 7C, and we have to show that the privacy interest in this case, which everybody concedes exists, outweighs the public interest. We don't get the free ride. We get under 7D. Is it true that everyone concedes that there's a privacy interest under 6 for my hypothetical evil competitor who wants nothing other than to do harm to his competitor, this company? Well, first of all, again, this is speculative, and the courts have held that if somebody is alleging that there's something bad going on, there has to be more than speculation. Favish underscored that. That's not my question. Maybe to address your question more directly. Whether the person who complains is a bad person or has bad motives makes no difference. So let me make sure. Let me formulate the question as cleanly as I can, and I guess I'm going to hear back from Mr. Kemp. I'm hypothesizing someone who is a competitor with credential locations, wishes to do harm to credential locations, writes an email to HUD full of falsehoods expecting, it turns out to be right, that there will be an expensive investigation undertaken that will harm credential investigation. And is that person's interest in avoiding having his name known, so he might be subject to some retribution from a credential, is that a privacy interest? Yes, it is. Because HUD, to rule otherwise, would be a number of things. First of all, it would require HUD to investigate people before it initiates an investigation. HUD does not do that. Why would it require HUD to investigate? Well, HUD, you're suggesting that there be some difference between whether or not he's got a good motive or a bad motive. No, no, no. This has nothing to do with whether HUD has to investigate. This has to do with whether after HUD has done something or after his letters come into HUD, HUD has to turn over the letter with the name attached. But FOIA is only there to expose what the government is up to. What does the fact that a person maybe has a bad motive or has a monetary motive? In False Claims Act cases, the relator has a monetary motive. What does the fact that he has a monetary motive have to do with what HUD does? Well, it may not. That's my question. It may have to do with what HUD does, but it may have to do with whether there's a privacy interest. If somebody is acting from purely business motives and, I mean, suppose they signed it, you know, Joe Smith, CEO of X company, and it was clear that this was totally a business matter. Okay. It had nothing to do with anything one would ordinarily call, quote, personal. Okay. Let's assume that it might reduce the privacy interest, although that's not the case because this Court has held that criminals have privacy interests and a lot of bad people have privacy interests. We don't look at that. Let's assume that. The problem with their case, and I notice Mr. Kim did not address it at all, is where is the public interest? Okay. And that's how you distinguish electronic frontier. Electronic frontier, you had people who were influencing the government. Their names made a difference. They might have had a conflict of interest. They might have been big campaign contributors. They did not have a privacy interest because they were paid lobbyists who were forced to register. That's a big difference. Let's take another hypothetical. Suppose somebody asked you for the complaint letters, names, and results of every confidential, every complaint you'd gotten in the last, you know, six months, and they want you to look over the lot of them and try to figure out whether people of X variety were, which were being investigated more or less, and whether you, and whether which, how they turned out. And maybe they wanted to write a report showing that when reports came in from competitors, they were usually turned out to be untrue, so HUD should be changing its practices and should be looking at who these people were before they start investigating. I understand that that's not exact, but suppose that were. Then what? Well. Then all of a sudden you would release it because it would be more public interest, even though the privacy interest is exactly the same? No. They're simply, here's the problem the plaintiff has in this case, and this is the difference between electronic frontier. This case, there is no public interest. I haven't heard any public interest. What about my hypothetical? In your hypothetical, or in any of the hypotheticals raised, the person's name has no bearing on what HUD does. FOIA only discloses the only public interest, and this is so, I mean, this is really, this court has cited it at great length in law and forest service. He's showing what the government is up to. If plaintiffs can show without speculating, we can always speculate, well, these might have been pedophiles. He might be serial killers. We've got to know what the government is doing about requests from serial killers. If they can show without speculating, well, they can't because I am up here telling you. They're not getting the information. That's the reason for having the information. But I am up here telling you that it does not matter if it's a bad guy, a good guy, if it's the governor of, if it's Governor Jerry Brown, or if it's Steve Frank. HUD is going to investigate those complaints. But the whole point of FOIA is to find out whether the government, when you make that representation, whether it's really what's happening. Right? That's the public interest, is to check up on the government to see whether when you say this is what we're doing, is that really what you're doing? Well, I'm, well, I am stating it. I'm here on behalf of HUD as their attorney. I'm telling you that's the way they operate. The worst thing that could happen in this case is it could be remanded back. We could submit an affidavit saying this is what they do, but that's a waste of judicial resources. The fact is we have to focus in on what these names, Joe Smith, you know, Harry Jones, whatever, what that is going to show about, not about Joe Smith or Harry Jones, but what it's going to show about what HUD is doing. And HUD is telling this court that whoever it is, it makes no difference on how they conduct or whether they conduct their investigation. Okay. Thank you very much. Thank you. Mr. Kim? Thank you very much, Your Honor. Again, I want to be really precise. I want to ask you a question. Oh, sure. Do we know, in fact, did they delete only the name, or did they also delete any identifying information that would have identified, for example, a position or a company or something like that? I presume that some of the matter redacted might be an address, a company name, because at least the 2003 letter, you know, sort of looks like business correspondence. There might be some sort of letterhead. But that's speculation on my part. I don't know exactly what has been redacted. But to get back to my point, I want to be really particular about the record here, because I don't like making representations in a brief that are not supported by the evidence in the record. There's no evidence at all in the record that HUD disregards the identity of complainants. What Mr. Frank suggests is maybe we get a chance to go back down to district court and read that. No, they made their record. If that was a mistake to omit that, if that's an important part of their argument, they have to live with that. That's the point I wanted to make there. Another very important point I wanted to make about the record is the district court's whole logic about, you know, the potential for unwelcome contact or harassment was based on a complete misunderstanding of our legal argument. And the district court specifically said that we had admitted that we were going to contact the people who wrote this letter, and we may even sue them. As we pointed out in our brief, that's far from the case. She was misconstruing. But does that make any difference? In other words, you know, that you made a representation, we don't intend to take any retaliatory action against these persons? That really can't be weighed by HUD, can it? No, no, absolutely not. And so that's an important distinction. But what I did want to point out is the district court simply made a factual error because the district court perceived that we were making the opposite representation, that we were saying we were going to contact these people and possibly sue them. And there's just no evidence of that in the record. As far as we know, you may or you may not. Sure. It's all speculation and conjecture at this point, what may be done. Just to clarify one thing. You asked for only these two letters that were filed against your client. What is the public interest? The public interest is simply, you know, knowing who are the people who are pulling HUD strings. Who are the people who is causing HUD to, you know, expand its own resources? In fact, I mean, you're going to get two names. And that's what you're going to get. I mean, you're not really going to be able to do any kind of looking at patterns or anything else. You're just going to find out who was after you. So isn't the only possible interest one in going after someone? I mean, it's really unclear why you want this. Sure. That's certainly why you want it in a way that fits within the public interest protection, i.e., in some way that tells you something about the operations of government. Yeah, exactly, Your Honor. Here's what one productive thing that is very consistent with HUD that would like to be done. And, again, I don't want to speak necessarily for the specific request, but more in a general public interest sense. You need to make a point to HUD. You have to be more selective about what investigations you're launching. Exactly. And to make that point, and, again, here, at least with respect to the second investigation, we have one that cost a lot of money and didn't go anywhere. To make that point to congressmen or to the President Obama, who ultimately oversees HUD, or the head of HUD or the regional head of HUD, we have to say, here's an example. Here's a person. How does the name help you make that? I mean, you've got everything you've said. We know. Sure. One investigation you guys got fined. Second investigation based on another, to you, anonymous tip, produces nothing. Okay. Why does the two names help you make the point that you just said would be useful to make? Because once we have the name, we can determine what were these individuals' interests. And our suspicion, and, again, it's only suspicion because we don't have any biographical information about these people, is at least that second person had some sort of vendetta or some ax to grind. So we need to make the point based on the specifics of that situation to HUD. You guys are patsies. You're being used by, frankly, a guy who sounds a little unhinged by looking at that e-mail, although he apparently knows something about RESPR, has some superficial knowledge. You guys are being patsies, and you're wasting everyone's time and money because you're allowing yourself to be manipulated by people with an agenda. And we can't really convincingly make that point without knowing anything about this person. If they were to tell us it's an employee, it's a competitor, it's a consumer, even in categorical views, that's some information. They're going to tell you, they're going to un-redact a line that says something about why he wants to be anonymous and his name, and that's going to be un-redacted. I'm sorry. All they're going to do is un-redact that letter, right, which contains one line that seems to say why the person wants to be anonymous, which they did redact, so they didn't only redact the name, and another line that has the name, and that's it. That's what they're going to tell you. And the name is very important because we can use publicly available information, you know, connected with that name to figure out who is this person? What's their interest? What's their connection? Are they a competitor? Are they a disgruntled former employee? What's key, though, is that that additional information that we obtain is not going to involve invading that individual's privacy. It's very different than lair or forced employees where the only value to getting the name is so you can interview that person. We don't need to interview anyone. Hawaii is a small town. Once we have that name, it's very likely that we'll know where the guy went to high school, what country club he belongs to, et cetera. I mean, that's just the way it is. So the name is very valuable as information by itself. Very different from lair and forced employees. Okay. Thank you very much. Thank you. Thank both sides for your useful information. Thank you. Credential locations versus HUD submitted.
judges: Tashima, Fletcher W. , Berzon